# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

D[redacted] W[redacted] through her parents Johnny and Beverly Williams,

Plaintiff,

v.

MILWAUKEE PUBLIC SCHOOLS,

Defendant.

Case No. 10-CV-1113-JPS

## ORDER

Johnny and Beverly Williams, proceeding *pro se*, on behalf of their daughter D[redacted] (referred to collectively as "plaintiffs"), bring this action under § 1415(i)(2)(A) of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, seeking judicial review of a decision of a Wisconsin administrative law judge ("ALJ"). Plaintiffs contest the ALJ's conclusion that during the 2009-2010 school year defendant Milwaukee Public Schools ("MPS") provided D[redacted] with a free, appropriate, public education ("FAPE") as required by the IDEA. Specifically, plaintiffs contest that the behavioral intervention plans ("BIP") and Individualized Education Plan ("IEP") that were in effect during the 2009-2010 school year were properly implemented. Moreover, plaintiffs also contest MPS's conclusion that the least restrictive environment in which D[redacted] would likely receive an FAPE for the 2010-2011 school year is a self-contained cognitive disability class that employs a curriculum that is based on extended grade band standards.

## 1. Background[1]

D[redacted] suffers from a moderate cognitive disability that has caused delays in the areas of reading, language, arts, and math. She has struggled with the disability throughout her childhood and began receiving special education through MPS in first grade at Thoreau Elementary School ("Thoreau"). Throughout her time at Thoreau, Dominique was placed in special classes that served only special needs children. Called multi-categorical classes, these classes serve children with varying disabilities. A multi-categorical special education class is less restrictive than a special education class that serves only children with a single specified disability, called self-contained cognitive disability classes.

In May of 2009, the Student's IEP team at Thoreau developed an IEP to be effective from May 13, 2009, to February 3, 2010. This IEP covered the remainder of her eighth grade year at Thoreau and carried over into her first year of high school. At the time the IEP was developed, it was not yet known which high school D[redacted] would attend. However, the IEP provided that D[redacted] be placed in multi-categorical classes, no matter where she enrolled. Before the start of the 2009-2010 school year, D[redacted] participated in MPS's procedure for her to select a particular high school to attend. Riverside High School ("Riverside") was D[redacted]'s first choice, but she was not selected in the random lottery to fill the limited seats available in the multi-categorical special education classes at Riverside. Instead, D[redacted] enrolled at Rufus King High School ("Rufus King") – her second choice – where there was space for her in the multi-categorical classes. D[redacted]'s twin sister, who is not disabled, and with whom D[redacted] has

[1] The facts are taken from the ALJ's opinion unless otherwise noted.

always attended the same school, was accepted for enrollment at Riverside. However, because both girls wanted to attend the same school, D[redacted]'s sister chose to attend Rufus King as well.

The IEP for the 2009-2010 school year identified D[redacted]'s present levels of performance as follows: mid-first grade level in math; mid-second grade level in both reading and language arts; the display of inappropriate behavioral skills 60% of the time – such as refusing to participate in class or following instructions; and some delayed functional and organizational skills affecting her ability to learn. The IEP included a functional behavioral assessment and a BIP that addressed two target, or "shutdown," behaviors: (1) her refusal to complete work; and (2) her frustration and confrontational attitude. The IEP also set out four annual goals: (1) increase math skills from the mid-first grade level to the second grade level; (2) increase language arts and writing skills from mid-second grade level to beginning third grade level; (3) increase reading skills from mid-second grade level to beginning third grade level; and (4) a behavioral goal to respond appropriately by cooperating with teachers and responding appropriately to redirection 60% of the time.

Unfortunately, D[redacted] performed poorly in almost all aspects of her educational programming throughout 2009-2010. She was chronically late for and frequently absent from her first hour math class. D[redacted] stated that she arrived late to class because she was embarrassed to be seen entering a special education classroom. When in attendance, she did not participate in note-taking, warm-up exercises, or in other exercises to demonstrate understanding of the material. The ALJ found that her math teacher implemented the accommodations and program modifications



Case 2:10-cv-01113-JPS Filed 04/11/12 Page 3 of 18 Document 24
Case 2:10-cv-01113-JPS Filed 04/11/12 Page 3 of 18 Document 24-1

required by her IEP; however, D[redacted] received grades of unsatisfactory throughout the 2009-2010 year in math because of her tardiness, absence, and refusal to participate.

In literacy, D[redacted] made a greater effort than in her math class, but she still refused to participate when asked to work individually or with a group, she did not follow the teacher's instructions, she never volunteered, and she did not respond to praise, encouragement, or one-to-one attention from her teacher. Nevertheless, D[redacted] was able to progress through two levels of her language program. Indeed, she achieved an IEP goal by advancing her fluency to a third grade level. However, D[redacted]'s comprehension did not significantly improve. She refused to take her final exam and received all "D's" in her literacy program. D[redacted] displayed similar behaviors in her other classes – namely she failed to participate – and she received a "C" in her health class, and either a "D" or "Unsatisfactory" in her other classes.

When her parents received her first ninth grade progress report, they became concerned about her poor performance and requested an IEP team meeting, which was held on November 20, 2009. D[redacted]'s shutdown behaviors were discussed at length, and the IEP team prepared a new BIP that identified preventative strategies to address her target behaviors. The team also adopted an annual IEP for November 20, 2009, to November 19, 2010, similar to the IEP already in place. On January 22, 2010, another IEP team meeting was held at the request of D[redacted]'s parents. The team discussed the BIP and it was noted that D[redacted]'s shutdown behaviors might have been a reaction to academic material she found too difficult to understand. The ALJ found that from November 20, 2009, to February 12,


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 4 of 18 Document 24-1

2010, MPS implemented all components of D[redacted]'s BIP and IEP. However, the student's shutdown behaviors continued.

On February 2, 2010, another IEP team meeting was held and the team again addressed the BIP as D[redacted] was continuing to shutdown at school. D[redacted]'s mother expressed her belief that her daughter needed additional accommodations and modifications to access the grade level curriculum in the multi-categorical classroom. The meeting was reconvened the following day, and it was at this time that the IEP team first discussed the possibility of placing D[redacted] in a self-contained cognitive disability class at Riverside, as Rufus King did not have such classes. D[redacted]'s mother expressed her objection to this change in placement. Instead of a change in placement, the team decided to assign D[redacted] a one-on-one aide, or paraprofessional, for three hours per day, in her math and language classes. The ALJ found that from February 12, 2010, through the end of the school year, MPS implemented the components of the BIP and IEP, including the supplementary aids and services. However, D[redacted]'s shutdown behaviors continued. Moreover, D[redacted] clashed with her paraprofessional, so that aide was replaced. Teachers observed that the paraprofessional's presence alongside D[redacted] seemed to cause her to display even greater frustration and embarrassment.

Sometime in late February or early March 2010, the IEP leader convened a meeting with all of D[redacted]'s teachers and D[redacted]'s mother to discuss her concerns that the teachers were not grading D[redacted] appropriately and were not implementing the BIP and IEP properly. In preparation for this meeting, each teacher prepared a report regarding their implementation of the IEP and D[redacted]'s performance in their respective


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 5 of 18 Document 24-1

classes. The teachers described how they graded D[redacted] how they implemented the IEP accommodations and modifications, and what D[redacted] had done in their classes to meet her annual goals and short term objectives.

On April 16, 2010, another IEP meeting was held at the parents' request to review and revise the IEP and to address the BIP. D[redacted]'s mother reiterated her belief that D[redacted] was not being graded based on her IEP goals and objectives and that she needed more accommodations and modifications to access the grade-level curriculum in the multi-categorical classes. She also expressed an interest in D[redacted] receiving instruction on functional skills – something that was only available in the self-contained classes at Riverside, not the multi-categorical classes. Other members of the IEP team concurred with the need for functional skills instruction, but also believed that D[redacted]'s moderate cognitive disability prevented her from receiving educational benefit in the multi-categorical classroom, even with accommodations and modifications. The educators believed her shutdown behaviors would continue in the Rufus King environment because of the difficulty she had in understanding grade-level instructional material. Instead, the educators found the best option was for D[redacted] to be placed in an educational environment that provided instruction more closely aligned with her present levels of performance, that included instruction on functional skills, and where the teacher would be able to provide her with more individualized instruction. The only environment where this was possible was at Riverside in its self-contained cognitive disability classes. Accordingly, D[redacted] would have to transfer to Riverside. D[redacted]'s



Case 2:10-cv-01113-JPS Filed 04/11/12 Page 6 of 18 Document 24
Case 2:10-cv-01113-JPS Filed 04/11/12 Page 6 of 18 Document 24-1

parents disagreed with this decision, requesting that she remain at Rufus King in the multi-categorical classes.

On May 11, 2010, the plaintiffs filed their due process complaint challenging the anticipated change of educational placement and location for the 2010-2011 school year as well as the sufficiency of the special education provided in the 2009-2010 school year. During the pendency of the due process proceedings, pursuant to the "stay put" provisions of the IDEA, D[redacted] has continued to receive educational services at Rufus King pursuant to the IEP developed in February of 2010. With these facts in mind, the court now turns to the substance of the plaintiffs' complaint.

**2. Discussion**

The IDEA entitles a disabled child to an education that is: (1) free; (2) appropriate; and (3) public. 20 U.S.C. § 1412(a)(1). A parent who believes that her child's rights under the IDEA were violated may pursue relief in state administrative proceedings. *See* 20 U.S.C. § 1415(f). D[redacted]'s parents did just that; however, an ALJ found for MPS on all issues raised by plaintiffs at the hearing.

"Any party aggrieved by the findings and decision" of the administrative proceedings may file a civil action in the federal district court or in any state court of competent jurisdiction. 20 U.S.C. § 1415(i)(2)(A). Having lost in the administrative proceedings, D[redacted]'s parents sought relief in the Wisconsin state courts. MPS then removed the action to the federal district court. However, the proceedings in this court were delayed as MPS failed to file a timely answer or other responsive pleading. After the court noted it would dismiss the case unless the defendant filed a responsive pleading or plaintiffs filed a motion for default judgment, the plaintiffs


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 7 of 18 Document 24-1

moved for default judgment. On that same day, the clerk entered the defendant's default. MPS then moved to vacate the entry of default – which the court granted – and subsequently filed an answer.

At the same time, due to the already protracted nature of the proceedings, the court directed the parties to brief the relevant issues relating to the administrative proceedings. Before filing their brief, the plaintiffs filed a motion to consider new evidence. The court denied the plaintiffs' motion, noting that they had failed to give the court particularized reasons for how the evidence would be probative of the issues before the court. Accordingly, the court determined that its disposition of the case would rest entirely on the administrative record. This is the norm in a proceeding for judicial review of administrative action, although the IDEA does provide a district court with the discretion to determine whether to hear additional evidence. 20 U.S.C. § 1415(i)(2)(C); *see Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 901-02 (7th Cir. 1996) (endorsing "the notion that courts need not receive additional evidence absent a strong justification for the proponent's failure to present it at the administrative level.").

Although neither party in this case moved for summary judgment, the court finds it has the authority to resolve the case as a matter of law, based on the administrative record. Indeed, a motion for summary judgment in a judicial review of administrative action is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record. *See Hunger v. Leininger*, 15 F.3d 664, 670 (7th Cir. 1994) (finding that the district court was entitled to grant summary judgment in favor of school district without school district's having requested it and without notice to




Case 2:10-cv-01113-JPS Filed 04/11/12 Page 8 of 18 Document 24-1

parents in action for judicial review under the IDEA where parents' conduct indicated they wanted resolution of issues of law).

Here, though [redacted]'s parents requested the court to consider evidence outside of the administrative record, the court determined that they had not shown sufficient cause. Accordingly, this case is much like the circumstances of *Hunger*, where the parents never indicated a desire to have the court consider evidence outside of the record, and thus, the court was entitled to grant summary judgment in favor of the school district, even though the district had not moved for summary judgment. *Id.* That is to say, this court has the authority to grant summary judgment in favor of MPS or in favor of plaintiffs if it finds, based on the administrative record, that either party is entitled to judgment as a matter of law. Moreover, as the court has already given notice to both the plaintiffs and the defendant that it will only be considering the administrative record, it is unnecessary to give any further notice to either side before granting summary judgment in the opposing side's favor. With that discussion, the court moves to the standard of review in IDEA cases.

### 2.1 Standard of Review

The IDEA provides that in reviewing the outcome of a due process hearing, a court: (1) "shall receive the records of the administrative proceedings"; (2) "shall hear additional evidence at the request of a party"; and (3) "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The party bringing the civil action and challenging the outcome of the state administrative proceedings has the burden of proof. *Alex R. ex rel. Beth R. v.*


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 9 of 18 Document 24-1

*Forrestville Valley Comm. Unit School Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004).

The hearing officer is not entitled to deference on issues of law. *Id.* "On issues of fact, however, district courts must accord 'due weight' to the decision of the hearing officer." *Id.* "Because school authorities are better suited than are federal judges to determine educational policy, the district court is required, in its independent evaluation of the evidence, to give due deference to the results of the administrative proceedings." *Beth B. v. Van Clay*, 282 F.3d 493, 496 (7th Cir. 2002). The degree of deference depends on how much new evidence is received by the district court – the more new evidence received, the less deference required. *See Alex R.*, 375 F.3d at 612. Where, as here, the court has declined to consider evidence outside the administrative record, the court "owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'" *Id.* This level of review is essentially the same as the clear error or substantial evidence standards. *Id.*

**2.2 Analysis**

As best as the court can discern, there are three issues to be addressed in this due process hearing appeal: (1) whether the BIPs that were in effect during the 2009-2010 school year were substantively appropriate; (2) whether MPS failed to properly implement D[redacted]'s IEP and BIPs during the 2009-2010 school year; and (3) whether the least restrictive environment in which D[redacted] would likely receive an FAPE for the 2010-2011 school year is a self-contained cognitive disability class that employs a curriculum that is based on extended grade band standards. The court will consider each issue in turn.


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 10 of 18 Document 24-1

### 2.2.1 Substantive Challenge to BIPs

As an initial matter, the court agrees with the ALJ that the behavioral intervention plans in effect for the 2009-2010 school year were substantively appropriate. BIPs are required when a disabled student exhibits behavior that impedes the learning of herself or others. Wis. Stat. § 115.787(3)(b)(1); 20 U.S.C. § 1414(d)(3)(B)(I). In such cases, a school district's IEP team must "consider the use of positive behavioral interventions and supports and other strategies to address that behavior." Wis. Stat. § 115.787(3)(b)(1). There is no dispute that D[redacted]'s behavior impeded her learning, and thus, federal and state law obliged MPS's IEP team at least to consider whether to implement a behavioral intervention plan, a consideration the IEP team clearly made. Indeed, the IEP team did not just consider implementing a BIP, but it also developed and implemented several BIPs throughout D[redacted]'s ninth grade year at Rufus King. Thus, MPS appears to have complied with the procedural requirements concerning BIPs. However, the plaintiffs challenge not the procedural adequacy of the BIPs, but rather their substantive value. In other words, plaintiffs maintain that the 2009-2010 behavioral intervention plans were substantively insufficient.

Yet, as noted in *Alex R.*, 375 F.3d at 615, the IDEA does not specify any substantive requirements for behavioral intervention plans. In the absence of any statutory guidance, the Seventh Circuit has declined to manufacture substantive criteria. *Id.* Instead, in *Alex R.*, the court found the BIP at issue to be substantively adequate, reasoning that it could not fall short of substantive criteria that did not exist. *Id.* Likewise, this court will not create substantive requirements when neither state nor federal law provide any guidance on such matters. Accordingly, the court concludes – as did the ALJ – that as a


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 11 of 18 Document 24-1

matter of law, D[redacted]'s BIPs were not substantively invalid under the IDEA.

### 2.2.2 Implementation of the IEP and BIPs

Regarding implementation of an IEP, the relevant regulation provides that a school district must "[p]rovide special education and related services to a child with a disability in accordance with the child's IEP" and "[m]ake a good faith effort to assist the child to achieve the goals and objectives or benchmarks listed in the IEP." 34 C.F.R. § 300.350(a). Here, D[redacted] and her parents contend that MPS failed to properly implement D[redacted]'s IEP – including her BIPs – during the 2009-2010 school year in a number of ways. The ALJ, however, found that MPS substantially implemented D[redacted]'s IEP and BIPs. After a review of the administrative record, the court finds no reason to depart from the ALJ's conclusion that the IEP and BIPs were properly implemented.

Plaintiffs first argue that MPS failed to comply with the IEP's requirement that D[redacted]'s teachers provide her with daily progress reports to be taken home to her parents. The plaintiffs contend that because D[redacted] never delivered these progress reports to her parents, her teachers must not have been providing her with these daily reports. However, the IEP made it D[redacted]'s responsibility to deliver these daily progress reports to her parents. Significantly, it did not require her teachers to ensure that such reports made it to D[redacted]'s parents. Though making it D[redacted]'s responsibility to get the reports to her parents may not have been the most effective course of action, the court's present concern is not whether the IEP team should have changed the requirement, it is whether the school district properly implemented this provision of the IEP. Though there



Case 2:10-cv-01113-JPS Filed 04/11/12 Page 12 of 18 Document 24
Case 2:10-cv-01113-JPS Filed 04/11/12 Page 12 of 18 Document 24-1

is little in the record to indicate that D[redacted]'s teachers did in fact provide her with daily progress reports – by way of testimony or other evidence – it is the plaintiffs' burden to establish that a violation of the IDEA occurred. They have not satisfied this burden and, therefore, the court finds that the ALJ did not err in finding that D[redacted]'s teachers implemented the IEP requirement of preparing daily progress reports.

Next, the plaintiffs make the generalized argument that MPS failed to implement fully all components of the BIPs and all accommodations and program modifications within the IEP. Yet, the only support that plaintiffs cite for this contention is the fact that D[redacted] was not performing well in school. However, the fact that D[redacted] was not performing well in school does not necessarily indicate that her teachers were not adhering to the IEP and BIP requirements. Indeed, there is ample evidence demonstrating compliance with the requirements. For example, at the February 12, 2010, IEP team meeting, the team decided to assign D[redacted] a paraprofessional to serve as her one-on-one aide for three hours per day in an attempt to address D[redacted]'s shutdown behaviors. The record reflects that the paraprofessional followed through and worked with D[redacted].

Moreover, the record shows that D[redacted]'s teachers were all aware of the IEP's requirements and all of them engaged in good faith efforts to implement the IEP and BIP requirements. Indeed, D[redacted]'s mother met with all of her teachers sometime in February or March of 2010. Before the meeting, the teachers prepared reports describing their efforts to implement the IEP and D[redacted]'s performance in class. The ALJ found that these reports reflected a good faith effort to implement the specific provisions of the IEP. This court tends to agree with the ALJ, as the plaintiffs have failed


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 13 of 18 Document 24-1

to demonstrate that the reports did not reflect the reality of the teachers' efforts. Accordingly, the court finds that MPS properly implemented the modifications and accommodations of D[redacted]'s IEP and BIPs.

Lastly, the plaintiffs argue that the IEP was not properly implemented because D[redacted] was not graded according to the annual goals and short term objectives of the IEP. However, the plaintiffs fail to support this claim with any substantive evidence in the record, other than the bare assertion that D[redacted]'s failing grades and lack of progress indicate improper implementation in this respect. In determining that MPS properly implemented her BIPs and IEPs, the ALJ noted it was possible for a student to make satisfactory progress toward an annual goal, yet at the same time barely earn a passing grade. Moreover, the ALJ found that the principal reason D[redacted] received poor grades was not because the teachers were inappropriately grading her, but rather because the ninth grade level curriculum provided in the multi-categorical classroom was significantly more difficult than her ability level, which exacerbated her behavioral impediments to learning. In other words, the difficulty of the material caused her to shutdown and stop participating in class. In turn, she did not complete her work and thus received poor grades. After carefully reviewing the record and finding no independent reason to disagree with the ALJ, the court will defer to his conclusion in this respect. Accordingly, the court finds that MPS properly implemented D[redacted]'s IEP and BIPs during the 2009-2010 school year.

### 2.2.3 Least Restrictive Environment for 2010-2011

The last issue the court must consider is whether MPS's decision to change D[redacted]'s placement from a multi-categorical class at Rufus King


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 14 of 18 Document 24-1

to a self-contained cognitive disability class at Riverside comports with the IDEA's requirement that children with disabilities receive a free appropriate public education in the least restrictive environment. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.114(a)(2). Plaintiffs object to this change of placement, contending there is no evidence to indicate that D[redacted]'s behavior – which they claim is the predominant impediment to her learning – would improve in the more restrictive environment of Riverside. On the other hand, MPS argues that D[redacted] requires an alternate curriculum that is not modeled after grade level core academic standards, but rather is aligned to extended grade band standards – which are used for students who cannot find success in core academic standards, no matter how much the curriculum is modified or adapted. MPS reasons that D[redacted] has struggled in the multi-categorical classes at Rufus King because the grade level material is too difficult for her, and thus, she becomes frustrated and refuses to participate in class. MPS believes that if D[redacted] is presented with work at her academic ability level – which will occur in the self-contained classes at Riverside – she will be less likely to shutdown and, therefore, more likely to find success academically.

Under the least restrictive environment provision of the IDEA, a school district must "mainstream" D[redacted] – that is, provide her an education with her non-disabled peers to the "greatest extent appropriate." 20 U.S.C. § 1412(5); *see also Beth B. v. Van Clay*, 282 F.3d at 499. However, sometimes children must be removed from regular classroom settings – or in this case, a multi-categorical class – because their education there, even with the use of supplemental aids and services, cannot be achieved satisfactorily. 34 C.F.R. § 300.550(b)(2). The Seventh Circuit has stated that in


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 15 of 18 Document 24-1

determining the appropriateness of a school district's decision to remove a student from a regular (or less restrictive) education placement to a more restrictive placement, the following inquiry should be made: if the student's education at the regular (or less restrictive) placement was satisfactory, the school district would be in violation of the IDEA by removing her and placing her in a more restrictive placement. *Beth B. v. Van Clay*, 282 F.3d at 499. If not – if its recommended placement will mainstream the student's education to the maximum appropriate extent – no violation occurs. *Id.* Thus, the court must ask whether D[redacted]'s experience at Rufus King was satisfactory and whether MPS's proposed change in placement mainstreams her to the maximum extent appropriate.

In this case, the court is quite satisfied that MPS's decision to remove D[redacted] from Rufus King did not violate the IDEA's mandate to mainstream disabled children to the maximum extent appropriate. At Rufus King, D[redacted]'s academic progress was virtually nonexistent and her developmental and functional progress was limited. Although MPS provided her with a paraprofessional for three hours daily as well as many other accommodations, the record makes clear that D[redacted] was receiving little benefit from her time at Rufus King. Indeed, one of D[redacted]'s IEP team representatives testified that, in her professional judgment, even if D[redacted]'s shutdown behaviors were fully eliminated and she participated in all aspects of her classes, it would still be unlikely that she would receive an educational benefit in the multi-categorical classes at Rufus King because of the extent of her cognitive disability and its effect on her learning.

Ultimately, the court cannot find any fault with MPS's decision to change D[redacted]'s placement from multi-categorical classes at Rufus King


Case 2:10-cv-01113-JPS Filed 04/11/12 Page 16 of 18 Document 24-1

to self-contained cognitive disability classes at Riverside that would amount to a violation of the IDEA. The school officials' decision about how to best educate D[redacted] is based on expertise that this court cannot parallel. The officials relied on almost a year of evidence that D[redacted] was not receiving a satisfactory education in the multi-categorical classes at Rufus King. Moreover, they relied on years of evidence showing that she struggled in multi-categorical classes at Thoreau. The Riverside placement shows a concern both for her development and for keeping her mainstreamed, to an appropriate extent, with her non-disabled peers. Thus, this court cannot hold that MPS has failed to provide her with the free, appropriate public education to which she is entitled under the IDEA.

Although the court respects the input D[redacted]'s parents have given regarding her placement, including their concern about her ability to successfully transition to another high school away from her sister and friends, as well as their continued participation in IEP decision-making, educators "have the power to provide handicapped children with an education they consider more appropriate than that proposed by the parents." *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988). Accordingly, the court finds that MPS has not violated the IDEA and, therefore, it will grant the defendant summary judgment as to each of plaintiffs' claims.

Therefore,

**IT IS ORDERED** that summary judgment be and the same is hereby **GRANTED** in favor of the defendant as to each of plaintiffs' claims; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on its merits together with costs as taxed by the clerk of the court.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge